925 P.2d 1091

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Duk Won LEE, Defendant–Appellant.**

No. 17294.

Supreme Court of Hawai'i.

Oct. 7, 1996.

Richard Crisman Linstrom, Honolulu, for defendant-appellant Duk Won Lee.

Loren J. Thomas, Deputy Prosecuting Attorney, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., KLEIN, LEVINSON and RAMIL, JJ., and Circuit Court Judge AIONA, in place of NAKAYAMA, J., Recused.

LEVINSON, Justice.

The defendant-appellant Duk Won Lee was convicted of attempted murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) §§ 707–701.5(1) (1993)[1] and 705–500 (1993),[2] following a jury trial. At trial, two of the prosecution's critical witnesses did not testify. Rather, transcripts of their testimony, given at the preliminary hearing, were read to the jury at trial, following a ruling by the trial court that the transcripts were admissible as evidence, pursuant to Hawai'i Rules of Evidence (HRE) Rules 804(a)(5) and 804(b)(1), because the witnesses were "unavailable" after the prosecution had made a "good faith" effort to·produce them.[3]

---

1. HRS § 707–701.5(1) provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. HRS § 705–500 provides:

    **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:

    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

    (b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances speci-fied in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

    (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

3. In order for "former testimony" to be admissible at trial as an exception to the general rule against hearsay, see HRE 802, it must—among other things—satisfy two provisions of HRE 804. First, the testimony must have been given in the proper setting under the proper circumstances; specifically, the testimony must have been

    given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, at the instance of or against a party with an opportunity tò develop the testimony by direct,

Lee raises two points of error on appeal. First, Lee contends that the trial court erred in concluding that the prosecution had met its burden of demonstrating a "good faith effort" to obtain the witnesses' presence at trial, thereby depriving him of his constitutional right to confront the witnesses against him as guaranteed by the federal and state constitutions.[4] Second, Lee argues that the trial court committed plain error, affecting his "substantial due process rights to a fair trial[,] when the circuit court *sua sponte* distributed pencils and note pads with instructions about note taking *after* one of the defense witnesses had been presented out of order, but all of the prosecutor's case was yet to be heard."[5]

We disagree with Lee's second point of error on appeal. However, because we determine that the prosecution did not meet its "good faith" obligation to guarantee Lee his constitutional right to confront the witnesses against him, we hold that the trial court erred in admitting the transcripts of former testimony as evidence. Accordingly, we vacate Lee's judgment of conviction and remand for a new trial.

## I. BACKGROUND

### A. The Episode

Three friends, Kwi Ha Lee (Kwi Ha), Jae Keun Lee (Jae Keun), and Kyon K.I. Min (Kyon), arrived at the Club Chateau, in downtown Honolulu, just after midnight on August 29, 1992. They were seated in a private room and were entertained by three hostesses. In the course of the soiree, a man pushed or kicked open the door to the room and, while uttering profanity, asked for "Duk Paul," a name also used by Kwi Ha. Kwi Ha asked the man why he was looking for him. The man grasped Kwi Ha's hair and attempted to force him outside to the parking lot. When Kwi Ha resisted, the man fired a round from a handgun into the air to Kwi Ha's left side.

At this point, the defendant Lee entered the room through the door. Kwi Ha testified at trial that Lee appeared to be intoxicated at the time and that Lee was "yelling to that shooter [i.e., gunman] something." Kwi Ha testified that he could not decipher exactly what Lee had said, but that his friends had later told him what Lee had stated. Kwi Ha added, "I thought he said kind of, you know, do something to me.... Well say kill him, something like that."[6] The gunman fired again, and this time the bullet struck Kwi Ha on the upper right portion of his forehead, an inch above his eye. Miraculously, Kwi Ha survived the point-blank shooting, although he lost his ability to smell. The gunman and Lee then fled the scene of the shooting. Lee was arrested approximately two hours later at another bar.

Neither Kyon nor Jae Keun appeared at Lee's trial. Instead, their accounts regarding the material events occurring at the Club Chateau were read to the jury from transcripts of their testimony given at Lee's preliminary hearing. Kyon testified at the pre-

cross, or redirect examination, with motive and interest similar to those of the party against whom now offered[.]
HRE 804(b)(1). Second, the proffered testimony must be that of a declarant who is "unavailable as a witness." HRE 804(b). "Unavailability of a witness" includes situations in which the declarant "[i]s absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means." HRE 804(a)(5).

4. The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" Similarly, article I, section 14 of the Hawai'i Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted

with the witnesses against the accused[.]." Article I, section 14 "was modeled after the sixth amendment and was intended to incorporate it and to give the State the benefit of federal decisions construing the same language." *State v. Wong*, 47 Haw. 361, 385, 389 P.2d 439, 452 (1964); *see also State v. Rodrigues*, 7 Haw.App. 80, 83, 742 P.2d 986, 988 (1987) ("The Confrontation Clause of the state constitution is substantially identical [to that of the sixth amendment.]").

5. Lee alleges "plain error" in this regard because he did not object or otherwise claim error at trial.

6. On cross-examination, Kwi Ha testified that he believed that Lee had said, "Chuk yo po ryu," which in Korean could mean, "Kill him here."

liminary hearing that he had heard Lee say, "Get out," but that Kyon did not know to whom Lee had directed the statement. Kyon testified that Lee then said, "Let's kill him right here." Jae Keun also testified at the preliminary hearing that he had heard Lee say, "[T]hen just kill him right here." Neither offered any explanation as to why Lee would have ordered Kwi Ha killed, although both were acquainted with Lee prior to the shooting.

Against the express advice of his attorney, the gunman, who identified himself as Kim Hyun Shin (Hyun Shin), appeared at trial as a witness for Lee. Hyun Shin testified that, late in the evening of August 28, 1992, he coaxed Lee into accompanying him to pick up Hyun Shin's girlfriend, Diane, who was completing her shift as a hostess at the Club Chateau. Hyun Shin testified that he met with Diane outside the Club Chateau, but that Diane advised him that she could not yet leave because she was serving "Tak Pal's" table. Hyun Shin became upset and instructed a waiter to call "Tak Pal." When Duk Paul (*i.e.*, Kwi Ha) did not materialize, Hyun Shin entered the Club Chateau "very angry." Hyun Shin believed that, shortly thereafter, Lee began to follow him.

Hyun Shin further testified that, upon locating the private room where Kwi Ha and his friends were drinking, he grasped Kwi Ha by the hair because he had "repeatedly asked [Kwi Ha] to go outside and talk and [Kwi Ha] didn't act like a man and I—that upseted [sic] me." Hyun Shin claimed to have produced his handgun because he had "felt threatened" by the others and believed that they were "about to grab ... the drink bottle." Hyun Shin admitted to shooting Kwi Ha, but maintained that he wanted to "just scare [Kwi Ha,] so I aimed at his ear." Hyun Shin recalled observing Lee walk into the room after the shooting; he also believed that Lee had been in the room at the beginning of the episode, but may have left in the interim. Hyun Shin vehemently denied that Lee had had any instrumentality in the shooting. He further denied that Lee had made any statement about killing anyone.

Lee also testified at trial in his own behalf and denied that he had ordered anyone to kill Kwi Ha or that he had even seen anyone in possession of a gun.

### B. *The Challenged Trial Procedures*

On March 16, 1993, prior to the commencement of Lee's trial, the prosecution filed a motion, which the trial court took under advisement, to admit into evidence those portions of the preliminary hearing transcript that reflected the testimony of Kyon and Jae Keun. In its supporting memorandum, the prosecution represented that it had "maintained location and telephone contact" with Kyon until approximately February 1993 and with Jae Keun until December 1992. The prosecution asserted that it had made "diligent and numerous attempts" to locate both witnesses, but to no avail. To corroborate its assertion, the prosecution attached two affidavits to its motion, one of Elwood Like, an investigator in the employ of the Office of the Prosecuting Attorney, and the other of Mari McCaig, a victim witness counselor also employed by the Prosecutor's Office.

Like averred in his affidavit that, on February 24, 1993, he was assigned to locate, among other witnesses, Kyon and Jae Keun. He represented that his attempts to locate Kyon became "futile" when Kwi Ha informed him that Kwi Ha had "received a long distance telephone call from [Kyon] approximately one month ago and that [Kyon had] stated that[ ] he was not in Hawaii." Like also represented that he checked Jae Keun's address and "learned from the present tenant that [Jae Keun had] moved out of the apartment approximately 2 months ago."

McCaig averred in her affidavit that she had maintained address and telephone contact with Kyon from September 4, 1992 through February 1993. She also represented that she had been maintaining contact with Jae Keun through Kwi Ha, but that her last knowledge of Jae Keun's whereabouts was in February 1993.

On March 18, 1993, the first day of the prosecution's case-in-chief, Detective Charles Chong of the Honolulu Police Department appeared as a witness. Detective Chong testified on direct examination that he had been assigned to investigate the incident at the

Club Chateau and had talked with Kyon and Jae Keun at the scene. He further testified that he had been unable to locate either Kyon or Jae Keun. He stated that he believed that Kyon had departed Hawaiʻi for Korea and that he had no leads as to Jae Keun's whereabouts.

Also on March 18, 1993, Kwi Ha was called by the prosecution as a material witness, pursuant to a bench warrant issued by the trial court to insure his presence at trial. On cross-examination by defense counsel, Kwi Ha addressed his relationship with Jae Keun; he expressed his belief that Jae Keun was presently in Hawaiʻi, but was difficult to contact. Kwi Ha further alluded to having provided the deputy prosecuting attorney with Jae Keun's pager number at work, testifying as follows:

> [Defense counsel]: You are saying [Jae Keun is] the kind of a person who is kind of worldly?
>
> [Kwi Ha]: He takes opportunities.
>
> Q. Explain it in Korean.
>
> A. Like to here like opportunist.
>
> Q. Opportunist?
>
> A. He's supposed to be here today, you know, but it's kind of hard to contact him. I told him I have to be here this week.
>
> He told me he may going to be here today but he's not here because he don't want to spend his time for this case, I think.
>
> Q. Why is that?
>
> A. Maybe he's so busy man.
>
> Q. He's a busy man?
>
> A. I don't know, that's—I try to give information to [the deputy prosecutor] about him, I gave the information already where he moved to but I asked him his new phone number, he didn't tell me. So I gave [the deputy prosecutor] his page number where he work at and where he moved to new place, that's what I gave the information so they can contact him.

On March 22, 1993, in the course of opposing the prosecution's motion, defense counsel objected on the record to the receipt into evidence of Kyon and Jae Keun's former testimony, as reflected in the transcript of the preliminary hearing, on the ground that

the prosecution had not made an adequate showing that it had undertaken a good faith effort to obtain the presence of the witnesses at trial, thus violating Lee's constitutional right to confront the witnesses against him.

The trial court disagreed and ruled that the former testimony of the two witnesses would be received into evidence. On the issue of unavailability, the trial court concluded that the prosecution had made "reasonable efforts and attempts to locate both of these witnesses." The trial court relied on the affidavits of Like and McCaig, in addition to Detective Chong's trial testimony, in concluding that the prosecution had made "good faith attempts, through vigorous and appropriate steps to procure *both* witnesses['] presence at trial." (Emphasis in original). Among the additional factors weighing in favor of admissibility, the trial court noted that defense counsel had been provided with partial discovery the day before the preliminary hearing was conducted and was permitted "full examinations of both witnesses" at the hearing, including "extensive cross-examination beyond what is normally afforded at a hearing of this nature." The trial court also took notice of the fact that Lee's trial counsel had represented him at the preliminary hearing.

Pursuant to the trial court's ruling, Kyon and Jae Keun's testimony adduced at Lee's preliminary hearing was read into the trial record.

Meanwhile, at the commencement of the evidentiary phase of the trial, the trial court granted defense counsel's request that a defense witness, Yong Ki Har (Yong Ki), be permitted to testify out of order (*i.e.*, before the prosecution began the presentation of its case-in-chief), on the basis that the witness desired to leave Oʻahu as soon as possible due to a family illness. Yong Ki testified that he owned the bar next to the Club Chateau and that he had greeted Lee in the parking lot outside the Club Chateau just before the shooting.

After Yong Ki testified, but before the prosecution began the presentation of its case-in-chief, the trial court *sua sponte* distributed pencils and note pads to the jury

and administered oral instructions on note-taking. Neither counsel objected.

At the end of the trial, the jury returned a guilty verdict as to the charged offense.[7] The trial court thereupon adjudged Lee guilty of attempted murder in the second degree and sentenced to him to a term of life imprisonment with the possibility of parole. Lee timely appealed.

## II. STANDARDS OF REVIEW

### A. Alleged Violation Of Right To Confrontation

Whether the prosecution has made an adequate showing of the "unavailability" of a witness—for the purpose of satisfying the confrontation clauses of the United States and Hawai'i Constitutions—is, at the first level of analysis, a question of fact for the trial court to decide, involving a determination of the nature of the prosecution's "good faith" efforts to secure the witness's presence at trial. Findings of fact are reviewed under the clearly erroneous standard. *State v. Ganal,* 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996); *Tachibana v. State,* 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995); *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994). A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left "with the definite and firm conviction that a mistake has been committed." *Ganal,* 81 Hawai'i at 368, 917 P.2d at 380; *Tachibana,* 79 Hawai'i at 231, 900 P.2d at 1298; *Furutani,* 76 Hawai'i at 179, 873 P.2d at 58.

At the second level of analysis, we ask whether the facts as found amount to a legally adequate good faith effort to confront the defendant with his accusers. This is a question of federal and/or state constitutional law, and we answer it by exercising our own " 'independent constitutional judgment [based] on the facts of the case.' " *Crosby v. State Dep't of Budget & Fin.,* 76 Hawai'i 332, 341, 876 P.2d 1300, 1309 (1994) (quoting *Connick v. Myers,* 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983)), *cert. denied* —— U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995). In other words, "application of constitutional principles to the facts as found ... requires us to examine the entire record and make an independent determination ... based upon that review and the totality of the circumstances[.]" *State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (citations, internal quotation marks, and emphasis omitted). Only in rare instances will reviewing courts hold constitutional error to be harmless. "Under *Chapman [v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ], an error of constitutional proportions can be disregarded as harmless [only] if the prosecution proves beyond a reasonable doubt that the error 'did not contribute to the verdict obtained.' " *State v. Samuel,* 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

### B. Plain Error

Pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b), "[p]lain errors or defects affecting substantial rights may be

---

**7.** There being no evidence that Lee personally fired the handgun at Kwi Ha, Lee's conviction was premised on accomplice liability, as delineated in HRS ch. 702 (1993). In this connection, HRS § 702–221 (1993) provides in relevant part:

> **Liability for conduct of another.** (1) A person is guilty of an offense if it is committed ... by the conduct of another person for which he is legally accountable....
> (2) A person is legally accountable for the conduct of another person when:
> ....
> (c) He is an accomplice of such other person in the commission of the offense.

HRS § 702–222 (1993) provides in relevant part:

> **Liability for conduct of another; complicity.** A person is an accomplice of another person in the commission of an offense if:

> (1) With the intention of promoting of facilitating the commission of the offense, the person:
> (a) Solicits the other person to commit it; or
> (b) Aids ... the other person in ... committing it[.]

HRS § 702–223 (1993) provides:

> **Liability for conduct of another; complicity with respect to the result.** When causing a particular result is an element of an offense, an accomplice in the conduct causing the result is an accomplice in the commission of that offense, if the accomplice acts, with respect to that result, with the same state of mind that is sufficient for the commission of the offense.

noticed although they were not brought to the attention of the court." This court's power to deal with plain error is one "to be exercised sparingly and with caution because the rule represents a departure from a presupposition of the adversarial system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *Raines v. State,* 79 Hawai'i 219, 226, 900 P.2d 1286, 1293 (1995) (quoting *State v. Kupau,* 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994)); *State v. Fox,* 70 Haw. 46, 56, 760 P.2d 670, 675–76 (1988). "[T]he decision to take notice of plain error must turn on the facts of the particular case to correct errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Fox,* 70 Haw. at 56, 760 P.2d at 676 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

## III. *DISCUSSION*

### A. *The Trial Court Did Not Commit Plain Error By Distributing Pencils And Note Pads After The First Trial Witness Had Already Testified.*

Lee complains on appeal that the trial court committed plain error by distributing pencils and note pads to the members of the jury and instructing them that notes could be taken after the first defense witness had testified but before the prosecution had begun the presentation of its case-in-chief. The case for plain error is extremely weak.

First, at the time the trial court made the distribution, it advised the members of the jury that, prior to commencing deliberations, it would instruct them "that all jurors should be given equal attention ... regardless of whether they took notes during the trial." Certainly, the trial court technically erred when it failed to follow through with its promise to readminister the instruction at the close of the evidence. Lee, however, neglected to object to the oversight. In any event, the trial court emphasized before the distribution (1) that the members of the jury were not required to take notes and that they should not attempt to memorialize everything that the attorneys or witnesses has

said and (2) that "no greater weight [was] to be given to the views of a juror whose recollection [was] based upon written notes as compared to whose view [was] based upon unrecorded recollection."

Second, although it is obvious that the trial court misspoke when—after Yong Ki had already testified—it instructed the jurors that they would "have the opportunity to take notes at all stages of the trial," it is equally obvious that the court's statement, taken in context, involved no deception. The trial court read the instruction from a paper, and the jurors doubtlessly understood that they had lost the opportunity to take notes regarding Yong Ki's testimony (as well as the attorneys' opening statements). Moreover, Yong Ki's testimony was brief and uncomplicated; as the owner of the bar adjacent to the Club Chateau, he simply testified that he had greeted Lee in the parking lot before the shooting occurred. That testimony, construed in the light most favorable to Lee, suggested that Lee had not acted or appeared in a suspicious manner, as a person who was about to commit murder might. But, as indicated, the testimony was brief, consisting of one easily remembered point. We are convinced that the trial court's failure to distribute pencils and note pads prior to the completion of Yong Ki's testimony did not amount to the kind of error that would seriously affect the fairness, integrity or public reputation of judicial proceeding at issue here.[8]

### B. *The Prosecution Did Not Satisfy Its Good Faith Obligation To Produce Kyon And Jae Keun As Trial Witnesses; Accordingly, They Were Not "Unavailable" For Purposes Of HRE 804(a)(5), And The Trial Court Reversibly Erred In Receiving Their Former Testimony—Adduced At Lee's Preliminary Hearing—Into Evidence.*

#### 1. *The "former testimony" hearsay exception and the constitutional right to confront witnesses*

In *State v. Adrian,* 51 Haw. 125, 453 P.2d 221 (1969), this court acknowledged that, be-

---

8. We are also unconvinced that the trial court's delayed distribution in any way trivialized Yong Ki's testimony. In fact, we believe it equally likely that the distribution *emphasized* the testi-

mony, inasmuch as the jury may well have inferred that the testimony's importance prompted the trial court to issue pencils and note pads.

cause "the confrontation clause of the sixth amendment [to the United States Constitution] is now applicable to the states, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the [United States] Supreme Court's interpretation of [the minimum protections accorded by] that provision is binding in this State and upon this court." *Id.* at 131, 453 P.2d at 225. Notwithstanding that "the right of confrontation is one of the fundamental personal rights guaranteed to an accused," *id.* (citation and internal quotation marks omitted), this court, in appropriate cases, permits "certain exceptions to the right of confrontation[,] such as ... testimony of an unavailable witness who gave testimony at previous judicial proceedings against the same defendant[,] which was subject to cross-examination by that defendant, if the [prosecution] has made a *good faith effort* to obtain the presence of the witness." *Id.* at 132–33, 453 P.2d at 226 (citing, *inter alia, Barber v. Page,* 390 U.S. 719, 722, 724, 88 S.Ct. 1318, 1320, 1321, 20 L.Ed.2d 255 (1968)) (emphasis added); *see also* HRE 804(a)(5) and 804(b)(1), *supra* at note 3.

In *Barber,* on which the *Adrian* court relied, the United States Supreme Court construed the foregoing exception to the constitutional right of confrontation in the following manner:

> ... [T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement.

> Here, the [prosecution] argues that the introduction of the [preliminary hearing] transcript is within that exception on the grounds that [the defendant] was outside the jurisdiction and therefore "unavailable" at the time of trial, and that the right of cross-examination was afforded [the defendant] at the preliminary hearing....

> ....

> ... [A] witness is not "unavailable" for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial....

390 U.S. at 722, 724–25, 88 S.Ct. at 1320, 1321–22 (citations omitted) (emphasis added).

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court, building, *inter alia,* on *Barber,* articulated a two-part test for assessing the admissibility of hearsay testimony as an exception to the constitutional right of confrontation:

> First, in conformance with the Framers' preference for face-to-face accusation, the [confrontation clause] establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the [confrontation] [c]lause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule....

> ....

> In sum, when a hearsay declarant is not present for cross-examination at trial, the [c]onfrontation [c]lause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 65–66, 100 S.Ct. at 2538–39 (citations, internal quotation marks, and footnote omitted).

This court expressly relied on the two-part *Roberts* test in *State v. Apilando,* 79 Hawai'i 128, 132–33, 900 P.2d 135, 139–40 (1995), subject to the caveat that, "[w]ith respect to the 'rule of necessity,' . . . we have remained resolute that[,] under the confrontation clause of the Hawai'i Constitution, a showing of the declarant's unavailability is necessary to promote the integrity of the fact finding process and to ensure fairness to defendants." *Apilando,* 79 Hawai'i at 133, 900 P.2d at 140 (quoting *State v. McGriff,* 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994)) (internal quotation signals omitted). Moreover, we emphasized that "the burden of establishing the declarant's 'unavailability' . . . rests with the prosecution." *Id.* at 140, 900 P.2d at 147 (citing *Roberts,* 448 U.S. at 75, 100 S.Ct. at 2544).

■ Thus, the two-part test that this court employs for determining the admissibility at trial of former testimony as an exception to the rule against hearsay, as constrained by the constitutional right of confrontation, is that: (1) the declarant must be presently unavailable despite the good faith efforts of the prosecution to obtain his or her presence; and (2) the former testimony must bear adequate "indicia of reliability," as evidenced, for example, by an opportunity for full and fair cross-examination on the part the defendant. Correlatively, if the prosecution fails to meet its threshold burden of demonstrating the declarant's "unavailability" despite its good faith efforts to obtain his or her presence, then the former testimony is inadmissible, and it is unnecessary to reach the question whether the former testimony otherwise bears sufficient indicia of reliability.

In the present case, Lee effectively concedes that if Kyon and Jae Keun were truly "unavailable" as witnesses at his trial, within the meaning of the confrontation clauses and HRE 804(a)(5), then their former testimony,

as adduced and transcribed at Lee's preliminary hearing, would be admissible as an exception to the rule against hearsay evidence, pursuant to HRE 804(b)(1).[9] Thus, the outcome-dispositive issue in this appeal is whether, pursuant to HRE 804(a)(5), the prosecution was "unable to procure the declarant's attendance by process or other reasonable means," which is essentially the first part of the *Roberts* test.

### 2. What is a "good faith effort"?

■ This court has never had occasion to articulate a holding delineating with objective specificity the kind of conduct that is required of the prosecution in order to meet its burden of establishing a "good faith effort" to obtain the presence of a witness at trial. On the one hand, we have held that merely "[e]stablishing that a witness has a forwarding address in another state" is insufficient, inasmuch as such a showing "at best only tends to prove the witness's absence from [Hawai'i]." *State v. Kim,* 55 Haw. 346, 350, 519 P.2d 1241, 1244 (1974). Accordingly, under such circumstances, the prosecution

> must show a good faith effort to ascertain the actual location of the witness, and thereafter, if necessary, to attempt to compel the witness's attendance at trial through use of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, [HRS ch. 836 (1993) ].

> Unless the [prosecution] can show a good faith attempt to use this statute to assure attendance of he witness, the [prosecution] may not introduce . . . pre-trial testimony of the absent witness. Where the suspected whereabouts of the witness are within one of the few states that may not have enacted the Uniform Act, a lesser showing of "unavailability" than that imposed here may suffice. *Also, a lesser showing of "unavailability" seems consti-*

---

9. Lee was represented by the same counsel at both the preliminary hearing and at trial. In the course of the preliminary hearing, defense counsel cross-examined both Kyon and Jae Keun. The transcript of Kyon's testimony comprises approximately nineteen pages of direct examination by the deputy prosecuting attorney (DPA),

fifteen pages of cross-examination by defense counsel, one page of redirect, one page of re-cross, and one page of re-redirect. The transcript of Jae Keun's testimony comprises approximately nine pages of direct examination by the DPA and twelve pages of cross-examination by defense counsel.

*tutionally sufficient when the witness is residing within a foreign country.*

*Id.* at 350–51, 519 P.2d at 1244–45 (citations and footnote omitted).[10]

On the other hand, in its review of circumstances under which the good faith requirement *has* been met, this court has held that when the prosecution requested of the military that it return a key witness—who was a serviceman—to Hawai'i, the prosecution had made a diligent effort to procure the witness's attendance at trial, despite the military's non-compliance with the request. *State v. Faafiti,* 54 Haw. 637, 641–42, 513 P.2d 697, 698, 701 (1973). In *State v. White,* 65 Haw. 286, 651 P.2d 470 (1982), we held that where (1) a police detective had secured a witness's presence at a defendant's first trial, (2) the same detective was reassigned to locate the witness for the defendant's retrial, (3) the detective contacted the witness's mother and directed other police officers to check various locations in the state where the witness was believed to have resided in the past, and (4) none of these efforts produced any leads, the prosecution "had made a good faith effort to secure the presence of the witness[.]" *Id.* at 288, 651 P.2d at 472. Similarly, in *State v. Bates,* 70 Haw. 343, 771 P.2d 509 (1989), this court held that the prosecution had met its burden of establishing a good faith attempt to obtain the presence of a witness at trial, where (1) a subpoena had been issued to compel the witness's attendance, (2) there had been four unsuccessful attempts to serve the subpoena, (3) the prosecution assigned an investigator to locate the witness, and (4) the investigator had (a) run computer checks on the witness's driver's license and motor vehicle registration, (b) checked voting records, telephone listings, and the witness's last known residence and work place, (c) spoken with the witness's former neighbors, (d) learned from the new owners of the witness's former residence that they believed the witness to be presently residing in Alaska, and (e) testified that further attempts to locate the witness in Alaska would be futile without further information. *Id.* at 346–47, 771 P.2d at 511.

In *State v. Ortiz,* 74 Haw. 343, 845 P.2d 547, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993), we reaffirmed the dual purposes of the confrontation clause: "The right of confrontation affords the accused both the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses." *Id.* at 360, 845 P.2d at 555 (citation omitted). We also reaffirmed and elaborated upon this court's general standard for determining what constitutes a good faith effort to obtain the presence of a witness at trial:

> [M]ere absence of the complaining witness, where there have been *vigorous and appropriate steps to procure the complaining witness' presence at trial,* does not necessarily constitute a violation of the right of confrontation if the out-of-court statements of the complaining witness have been made in such circumstances as to be so reliable that cross-examination does not appear necessary or there has been an opportunity for cross-examination[.]

[*State v. Beyer,* 72 Haw. 469, 473, 822 P.2d 519, 521 (1991).[11]]

To demonstrate the unavailability of a declarant at trial, the prosecution must show that it made a good faith attempt to secure his or her presence. To establish this good faith attempt, the prosecution must confirm on the record at the time of trial both the declarant's unavailability and that vigorous and appropriate steps were taken to procure the declarant's presence at trial. . . .

---

10. Regarding the highlighted language quoted *supra,* the *Kim* court hastened to add that "[t]here is . . . even some question as to the present day validity of this statement of the law as it may apply to United States' nationals residing abroad, in light of 28 U.S.C. § 1783." *Id.* at 351 n. 5, 519 P.2d at 1245 n. 5 (citations omitted).

11. In *Beyer,* we held that the defendant's right to confrontation had been violated when the trial court denied the prosecution's request to issue a bench warrant for the complaining witness. Although the witness had been subpoenaed and had refused to appear, we held that "[m]ere service of a subpoena on the complaining witness did not establish her unavailability[.]" 72 Haw. at 473, 822 P.2d at 521.

*Id.* at 363, 845 P.2d at 556–57 (some citations omitted) (emphasis in original).[12]

*Beyer* and *Ortiz* evidenced this court's search for a "good faith effort" standard that would optimally protect a defendant's constitutional right of confrontation and, at the same time, reasonably accommodate the prosecution's legitimate entitlement—under appropriate circumstances—to the admissibility of "former testimony." Nevertheless, the "vigorous and appropriate steps" criterion enunciated in those cases failed to supply an *objective* standard for ascertaining when the prosecution had satisfied its burden of demonstrating a "good faith effort" to obtain the presence of a missing witness.

In *State v. Moore*, 82 Hawai'i 202, 921 P.2d 122 (1996), however, we identified what we believe to be that objective standard. Acknowledging the defendant's citation of *United States v. Lynch*, 499 F.2d 1011, 1023 (D.C.Cir.1974), for the proposition that establishment of the prosecution's reasonable efforts to secure the presence of the declarant "require[s] a search equally as vigorous as that which the government would undertake to find a critical witness if it has no prior testimony to rely upon in the event of 'unavailability,'" we stated that we "d[id] not disagree" with the proposition, but deemed the standard subsumed within it to have been met. *Moore*, 82 Hawai'i at 224, 921 P.2d at 144.[13] We now expressly adopt the *Lynch* standard. *See also United States v. Mann*, 590 F.2d 361, 367 (1st Cir.1978) ("The government did not make as vigorous an attempt to secure the presence of the witness as it would have made if it did not have the prior recorded testimony. The language of Rule 804(a)(5) suggests that 'other reasonable means' besides subpoenas must be tried before a witness can be found unavailable. This relatively high good faith standard cannot be satisfied by perfunctory efforts, if the rule is not to sanction the government's procuring depositions of witnesses, especially shaky witnesses, but then discourage attempts to bring the witness to trial so long as the government is satisfied with what is in the transcript." (Footnotes omitted.)); *United States v. Quinn*, 901 F.2d 522, 528–29 (6th Cir.1990) (expressly approving *Lynch* and *Mann* and stating that, "[w]hile we decline to attribute bad faith to the Government's effort, we are compelled to observe that it was singularly unenthusiastic. The conclusion that the Government has not satisfied its burden here is reinforced by the crucial nature of [the witness's] testimony to the Government's case.... Perhaps most important, the credibility of [the witness's] testimony was highly suspect.... Confrontation [c]lause considerations are especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant." (Citation and internal quotation marks omitted.)).

3. *The prosecution has failed to satisfy its burden of demonstrating an adequate good faith effort to obtain Kyon and Jae Keun's presence at trial.*

Measuring the totality of the circumstances as reflected in the record before us against the *Lynch* standard articulated in *Moore* and expressly adopted in this opinion, and within the greater context of this court's case law cited *supra*, we are compelled to hold that the prosecution has failed to satisfy its burden of demonstrating an adequate good faith effort to obtain the presence of Kyon and Jae Keun at Lee's trial.

The prosecution has made no claim, either in the trial court or on appeal, that it attempted at any time to issue—much less serve—trial subpoenas on Kyon or Jae Keun. Nor has the prosecution claimed, beyond having assigned Like to locate the missing

---

12. Because the prosecution in *Ortiz* had both failed to issue a trial subpoena for the witness and otherwise to establish her unavailability, we held that the requisite good faith effort was lacking. *Id.* at 363, 845 P.2d at 557.

13. In *Moore*, we held that the prosecution had satisfied the *Lynch* test by obtaining explicit assurances from the complaining witness that she would testify and serving her with a trial subpoena to assure her appearance at trial. Despite the prosecution's efforts, the complaining witness fled the jurisdiction after jeopardy had attached. Moreover, the trial court had denied the prosecution's motion for a continuance, by which the prosecution would have sought to secure the witness's presence. *Moore*, 82 Hawai'i at 224, 921 P.2d at 144.

witnesses, that it undertook any effective implementation of the measures enumerated in *Bates,* such as driver's license or motor vehicle registration searches, in an effort to locate these witnesses.

■ Although Detective Chong testified that he had received information that Jae Keun had left the state and that he had no further leads, Kwi Ha testified on the same day that he had recently informed the deputy prosecuting attorney of Jae Keun's presence in Hawai'i and had specifically provided him with Jae Keun's work pager number. Thus, the record is far from clear that the prosecution did, in fact, pursue all available leads.

> At least where the evidence indicates that a crucial government witness, who is physically and mentally capable of testifying, is within the jurisdiction of the court, the prosecution must demonstrate that it has been unable to obtain the witness'[s] presence through a search exercised both in good faith and with reasonable diligence and care.

*Lynch,* 499 F.2d at 1023. In light of Kwi Ha's testimony, the record simply does not establish that Jae Keun was not in Hawai'i. The record of the prosecution's search consists solely of Like's affidavit, averring that he "checked the address of Jae Keun" and "learned from the present tenant" that Jae Keun had vacated the premises. There has been no showing of any follow-up, not even a simple inquiry as to a possible forwarding address.

■ As for Kyon, Like testified that Kwi Ha told him that Kyon was not in Hawai'i and, thus, that it would be "futile" to investigate further. But, under the *Lynch* standard, a mere bald and conclusory assertion of "futility" is insufficient proof of unavailability without *something* more. "Surely the prosecution's mere speculation about the difficulty of locating [the witness] cannot relieve it of the obligation to attempt to find [him]. Although the rigor of the undertaking might serve to palliate a failure to prevail, it cannot justify a failure even to try." *Roberts,* 448 U.S. at 80, 100 S.Ct. at 2546 (Brennan, J., dissenting).

We are especially troubled by the admission of the absentee testimony when we consider that Kyon and Jae Keun were acquaintances, if not friends, of both Kwi Ha and Lee. That being the case, there may have been friendly or hostile biases that colored their accounts, at Lee's preliminary hearing, of the events of August 29, 1992. We mention this possibility, "not to impugn the credibility of [the witnesses], since credibility determinations are left to the trier of fact, but to stress the importance of the jury's opportunity to assess the demeanor of th[ese] particular witness[es]." *Quinn,* 901 F.2d at 529.

Given the prosecution's regular contact with both Kyon and Jae Keun until the month before trial, the prosecution appears to have been remarkably uninquisitive regarding their sudden disappearances and speedily reconciled to the loss of their availability for trial.

> It is difficult to believe that if the preliminary hearing testimony of th[ese] critical witness[es] were not available, the prosecution would have abandoned its efforts at this point to locate [the witnesses] and concluded its case. We believe [that] the prosecution would have asked the court for additional time within which to find [them].

*Lynch,* 499 F.2d at 1024; *see also Moore, supra.*

Finally, it is illuminating to compare the prosecution's efforts to locate Kyon and Jae Keun with its actions guaranteeing Kwi Ha's presence at trial. At the commencement of trial, the trial court granted the prosecution's motion to declare Kwi Ha a material witness. As a result, the trial court issued a bench warrant, and Kwi Ha was taken into custody, bail being set at $20,000.00 to prevent (or so the prosecution represented) Kwi Ha's absconding the country and thereby becoming "unavailable." Compared to the prosecution's assiduous efforts to ensure Kwi Ha's presence at trial, we have no difficulty in labeling its attempts to obtain the presence of Kyon and Jae Keun as "singularly unenthusiastic." *Quinn,* 901 F.2d at 528.

For the foregoing reasons, having examined the entire record and made an independent determination based upon that review and the totality of the circumstances, *see*

*Hoey,* 77 Hawai'i at 32, 881 P.2d at 519, and exercising our own independent constitutional judgment based on the facts of the case, *see Crosby,* 76 Hawai'i at 341, 876 P.2d at 1309, we hold that the trial court erred in admitting the "former testimony" of Kyon and Jae Keun. Their testimony was vital to the prosecution's case against Lee, dependent as it was upon the construct of accomplice liability. Without it, there was no evidence that Lee ever instructed Hyun Shin to kill Kwi Ha, inasmuch as Kwi Ha testified that he himself was not certain as to exactly what Lee said at the time. Because of the prosecution's lackluster efforts to maintain contact with these two key accusers and obtain their presence at trial, Lee was denied his constitutional right to confront them. Moreover, precisely because the prosecution's case literally rose or fell on Kyon and Jae Keun's testimony, we cannot say beyond a reasonable doubt that the trial court's error did not contribute to the jury's guilty verdict. *See Samuel,* 74 Haw. at 148, 838 P.2d at 1378.

## IV. CONCLUSION

In light of the foregoing analysis, we hold that the trial court did not commit plain error by distributing pencils and note pads to the jury after the first witness testified. However, we further hold that the prosecution failed to satisfy its burden of demonstrating a "good faith effort" to obtain the presence of two key prosecution witnesses at trial and, consequently, that the witnesses were not "unavailable" within the meaning of HRE 804(a)(5). Accordingly, we hold that the trial court erred in admitting their "former testimony" as evidence, thus violating Lee's constitutional right to confront the witnesses against him at trial.

We vacate Lee's judgment of conviction and remand for a new trial.