925 P.2d 818

STATE of Hawai'i, Plaintiff–Appellant,

v.

John Raymond TRAINOR,
Defendant–Appellee.

No. 17292.

Supreme Court of Hawai'i.

Oct. 14, 1996.

As Amended Oct. 22, 1996.

James H.S. Choi, Deputy Prosecuting Attorney, on the briefs, Honolulu, for Plaintiff–Appellant State of Hawai'i.

Ignacio R. Garcia of Garcia, Garcia, and Rosenberg, on the briefs, Honolulu, for Defendant–Appellee John Raymond Trainor.

Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and CORINNE K.A. WATANABE, Intermediate Court of Appeals Judge, in place of MOON, C.J., recused.

LEVINSON, Justice.

The plaintiff-appellant State of Hawai'i (prosecution) appeals from the circuit court's July 7, 1993 order granting the defendant-appellee John Raymond Trainor's motion to suppress evidence. The prosecution grounds its appeal in two alternative arguments: (1) that the evidence at issue was not the fruit of an unlawful "walk and talk," but was a constitutional investigative encounter based upon reasonable suspicion; and (2) that the encounter resulting in the discovery of the evidence was consensual. Because we hold that Trainor was subjected to an unconstitutional seizure, justified neither by reasonable suspicion nor consent, we affirm.

## I. BACKGROUND

Trainor was arrested at the Honolulu International Airport on March 24, 1993 by Officer Linda D'Aquila of the Honolulu Police Department (HPD), following the recovery of a bundle of cocaine that had recently been on Trainor's person. On April 12, 1993, Trainor was charged by complaint with promoting a dangerous drug in the first degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (1993).[1] Trainor filed a

---

1. HRS § 712–1241 (1993) provides in relevant part:

**Promoting a dangerous drug in the first degree.** (1) A person commits the offense of

"motion to suppress statement" on May 27, 1993, seeking to suppress the cocaine.[2]

Officer D'Aquila was the only witness called at the hearing on the motion to suppress. Officer D'Aquila testified that she was a police officer assigned to HPD's Narcotics Vice Division, Airport Detail. She had been a police officer for five years and had been assigned to the Narcotic Vice Division for over a year and a half. She testified that she had received training in identification of narcotics and methods of concealment and trafficking, and had attended drug conferences and a week-long DEA school on the mainland.

Regarding the incident material to this appeal, Officer D'Aquila testified that, on March 24, 1993, she was engaged in walk and talk investigations[3] at the Honolulu International Airport. She was dressed in plain clothes, without visible identifying police insignia, and was carrying a weapon that was not outwardly visible. At 6:45 p.m., she began to observe passengers disembarking TWA Flight No. 31, which had recently arrived from Los Angeles. That particular flight was targeted because Los Angeles was considered a "source city" for drugs. Officer D'Aquila noticed a male—not Trainor—whom she wanted to observe further, so she followed him from the gate to the TWA baggage claim area. She observed the male for about five minutes, but did not approach him. As passengers began to fill up the baggage claim area, she first became aware of Trainor.

When asked what observations she made of Trainor when she first noticed him, Officer D'Aquila testified that: (1) Trainor was wearing baggy clothes that could conceal a "body carry" of drugs; (2) he had only carry-on luggage; (3) his face was "flushed and shinny [sic] looking," as if he were perspiring; (4) he "was walking at a very fast pace"; (5) he "looked like he was looking around" with "a very darting look"; and (6) he was traveling alone. Trainor's clothing and behavior were, according to Officer D'Aquila, consistent with those of drug couriers. However, on cross-examination, she conceded that baggy clothing was a current fashion.

Officer D'Aquila maintained that Trainor's demeanor and physical appearance provided "objective reasons to approach him and ask him about drugs." In this connection, she testified as follows:

[By defense counsel:] Okay. Now, you indicated that you approached Mr. Trainor to talk to him because he looked flushed and he was perspiring shinny [sic]?

[By Trainor:] And walking quickly.

Q. And walking quickly.

A. And the way he looked right before he went out the door, the way he looked to his right and scanned the area.

Q. He scanned—he waked [sic] quickly towards the door, he looked flushed and shinny [sic], and you felt that was objective reasons to approach him and ask him about drugs?

A. Yes, sir.

Officer D'Aquila "guessed" that, of the "several hundred" people whom she had approached in the twenty-month period during which she had conducted "walk and talk"

---

promoting a dangerous drug in the first degree if the person knowingly:
   (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
     (i) One ounce of more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

2. Although the motion was entitled "Motion to Suppress Statement," Trainor advised the circuit court that he was "not moving to suppress any statements, just the evidence that was found." The circuit court "took [the motion] as meaning [a motion to suppress] evidence."

3. For a general description of "walk and talk" investigations, see State v. Quino, 74 Haw. 161, 840 P.2d 358 (1992), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993), and State v. Kearns, 75 Haw. 558, 867 P.2d 903 (1994). On cross-examination, Officer D'Aquila testified that, after the Quino decision was filed, she was instructed that the walk and talk procedure should be modified, such that, "per [Quino], we're not supposed to just talk to people randomly, we're supposed to talk to people—gain objective basis for approaching somebody, number one. And number two, we're required to tell them what our office is from the very beginning, we investigate narcotic trafficking at the airport."

investigations, "maybe about ten percent" had been in possession of illegal drugs. Officer D'Aquila also acknowledged that HPD regarded "any of the major cities" in the United States and all of the west coast cities from which airline flights arrived in Hawai'i as drug source cities, although the Vice Narcotics detail concentrated "mainly . . . on the westcoast [sic] cities."

Understandably, much of Officer D'Aquila's testimony focused on the encounter itself. Officer D'Aquila testified that, after Trainor exited the baggage claim area into the street fronting the airport terminal, he ordered a cab at the taxi stand. She then approached Trainor, told him that she was a police officer, and displayed her badge. Accordingly, the taxi dispatcher "just stood to the side" and did not summon the cab. Officer D'Aquila asked Trainor if she could talk to him for a minute. After he said, "Yeah," she told him that she was investigating narcotics trafficking at the airport. Officer D'Aquila represented to Trainor that he was not under arrest and was free to leave at any time. Next, she asked Trainor if he had just arrived on the TWA flight from Los Angeles, to which he replied that he had. She asked whether he was a returning Hawai'i resident or from California. After he replied that he was from California, she asked whether he was on business or vacation; he replied that he "was here for a couple of days to get some sun."

Officer D'Aquila asked Trainor his name—to which Trainor replied, "John"—and then asked "to take a look" at his airline ticket. Trainor stated that the ticket was under another name and that a friend had bought it for him. Trainor removed the ticket from his bag and handed it to her. Officer D'Aquila noticed that the ticket had been issued to "Perry Peterson," was for "a quick turnaround" of two days, and had been paid for in cash. She testified that drug couriers often pay for tickets in cash, travel under assumed names, and "make quick turnaround trips [of] maybe one day or two days." After she inspected the ticket, Officer D'Aquila

asked Trainor for identification, and he produced a California driver's license issued to John Raymond Trainor. She viewed the license, noticed that the photograph on it looked like Trainor, and returned both the ticket and the driver's license.

Officer D'Aquila inquired whether Trainor knew anyone in Hawai'i, and he replied that he did not. She asked where he was going to stay, and he answered that "he was going straight to the Roofers' Union" to "look for a job." She noted the inconsistency between the answer and Trainor's previous statement that he was in Hawai'i for a couple of days to get some sun.

Officer D'Aquila repeated that she was investigating narcotic trafficking and asked Trainor whether he was "carrying any kind of marijuana or narcotics" with him. Trainor answered, "No," while, in Officer D'Aquila's opinion, avoiding eye contact with her and looking at the ground. She then asked to check Trainor's bag, which was on the ground next to him, and Trainor acquiesced. Officer D'Aquila knelt down to look through the bag and found nothing of interest.

Aware of Trainor's "baggy clothing and everything and knowing he might possible [sic] have a body carry," Officer D'Aquila formed the belief that Trainor "might be hiding something." Accordingly, she asked Trainor if he had anything around his waist, to which Trainor replied, "No." She asked Trainor whether she could pat him down. Trainor responded, "Okay," and moved his arms slightly away from his body.[4] Officer D'Aquila touched the area of Trainor's stomach with an open palm and felt a firm, thick, squarish bundle. Having felt the object, she asked Trainor what it was; Trainor replied that it was food. She then asked to see the object, at which point Trainor "suddenly bolted and ran," leaving his bag behind.

Officer D'Aquila pursued Trainor, repeatedly shouting, "Stop, police." An airport security officer joined her in the chase. The security officer caught and tackled Trainor approximately one hundred yards from the taxi stand. In the course of the chase, Offi-

---

4. Finding of Fact (FOF) No. 25 of the circuit court's July 7, 1993 decision and order, which is the only FOF challenged by the prosecution, stated in relevant part that "[t]here was evidently no verbal response, but [Trainor] moved his arms 'out a bit.'"

cer D'Aquila observed Trainor remove an object from his waist area and throw it into the foliage. She eventually recovered the object, which was a firmly packed bundle wrapped in cream colored masking tape. After she had obtained a search warrant authorizing her to open the bundle, it was determined to contain cocaine.

The circuit court took the matter under advisement at the conclusion of the hearing, and, on July 7, 1993, filed its decision and order granting Trainor's motion to suppress. The decision and order included the following "discussion" and conclusions of law (COLs):

## II. DISCUSSION

. . . .

Like [*State v. Quino,* 74 Haw. 161, 840 P.2d 358 (1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993),] the approach here is made for the specific purpose of investigating drug trafficking; the Officer questioned Trainor with questions starting from general ( ["Can I talk to you."] ) and progressing to intrusive (starting at least by [inquiries as to whether Trainor knew anyone in Hawai'i and where he was going to stay] ). The "voluntary conversation" became accusatory in nature, certainly [when Officer D'Aquila asked Trainor whether he was carrying any marijuana or narcotics]. After asking if Trainor was carrying narcotics, she asked to . . . search his bag (and search[ed] it), and then asked if she could pat Trainor down; she then would have touched his person, but for having encountered the "corner" of an object.

The *Quino* court held that "once the stop turned from general to inquisitive, a reasonable person [in Quino's position] would not have believed [that] he was free to ignore the officer's inquiries and walk away." ( [74 Haw. at 173, 840 P.2d at 364] ). The Supreme Court concluded there was a seizure.

A major difference, of course, in this case is that Trainor was informed once, at the outset, that he was free to leave and was not under arrest. **The impact of this early warning must be considered diminished by the time an officer, having dis-**played a badge, undertakes questioning and a search and, not quite ultimately, asks if she can conduct a pat-down. A reasonable person would, in this Court's view, associate this with an arrest, and a non-consensual encounter.**

Further, *Quino* confirms that an investigative stop can only be based on "specific and articulable facts . . . [warranting a reasonable belief] that criminal activity is afoot." Here, the facts known to the Officer at the approach were **scant**: She knew only that Trainor was perspiring, was wearing baggy clothes, had a small (carry) bag but no checked baggage, nor did he get any; he looked around baggage claim and went outside to speak with a taxi dispatcher. She did not know, however, if Trainor had come off a flight or was there to pick someone up—maybe late, maybe thought he missed the person, maybe did a quick check and then decided to ask the taxi dispatcher if he'd called a cab for somebody. Of course, there is no evidence of this; the point is, it's not unreasonable. In this Court's view, the real suspicion came as a post-**staged**-encounter development. This is what the Supreme Court found unacceptable.

. . . .

## III. CONCLUSIONS OF LAW

1. The circumstances of this case bring it within the proscriptions of *Quino.*

2. Given the facts . . ., the encounter itself seems to have interfered almost immediately with [Trainor's] freedom to depart the airport, and to have little factually to make it anything other than random.

3. This is a *Quino* proscribed "random," "staged," "pretextual" encounter, which up to the point of the request for a patdown [sic] had produced precious little.

4. The Court concludes that encounter itself would, under *Quino,* warrant suppression.

5. However, further, as to the informed consent issue presented by this case, although the officer's initial statement was made, it is insufficient under the facts, to warrant continued interpreted consent to a

patdown [sic]. After constant, direct, and ever-more accusatory questioning, and one search conducted already, to ask for and interpret consent to a patdown (associated in the reasonable person's mind with detention or arrest), stretches the idea of voluntary/informed consent to the breaking point, particularly where no verbal consent is actually given.[5]

ACCORDINGLY, the Motion to Suppress Evidence is hereby Granted.

(Some ellipsis points and brackets in original and some added.) (All highlighted language in "Discussion" section challenged by prosecution on appeal.)

■ The prosecution timely appealed, generally challenging the circuit court's order granting Trainor's motion to suppress and taking specific issue with the highlighted portions of the circuit court's "discussion," the court's Finding of Fact (FOF) No. 25, *see supra* note 4, and all of its COLs.

## II. STANDARDS OF REVIEW

… Under the test approved in *Quino*, a person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. 74 Haw. at 168–73, 840 P.2d at 362–64. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews *de novo*. *See State v. Tsukiyama*, 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974). *State v. Kearns*, 75 Haw. 558, 566, 867 P.2d 903, 907 (1994).

■ Whether a person has "consented" to an investigative encounter—for the purpose of satisfying article I, section 7 of the Hawai'i Constitution (1978), *see infra* note 6—is, at the first level of analysis, a question of fact for the trial court to decide, involving a determination as to (1) whether the person was timely advised that he or she had the right to decline to participate in the encounter and could leave at any time, and (2)

whether, thereafter, the person voluntarily participated in the encounter. *Kearns*, 75 Haw. at 571, 867 P.2d at 909. Findings of fact are reviewed under the clearly erroneous standard. *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, —— (Haw.1996); *State v. Ganal*, 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996); *Tachibana v. State*, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995). A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left "with the definite and firm conviction that a mistake has been committed." *Lee*, 83 Hawai'i at 273, 925 P.2d at 1097; *Ganal*, 81 Hawai'i at 368, 917 P.2d at 380; *Tachibana*, 79 Hawai'i at 231, 900 P.2d at 1298.

■ At the second level of analysis, we ask whether the facts as found amount to legally adequate "consent." "This is a question of … constitutional law, and we answer it by exercising our own independent constitutional judgment based on the facts of the case." *Lee*, 83 Hawai'i at 273, 925 P.2d at 1097 (citations, internal quotation marks, and brackets omitted.). In other words, application of constitutional principles to the facts as found requires us to "examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of the circumstances[.]" *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citations and internal quotation marks omitted). *See also Lee*, 83 Hawai'i at 273, 925 P.2d at 1097; *State v. Merino*, 81 Hawai'i 198, 220, 915 P.2d 672, 694 (1996). Therefore, the *de novo* standard of appellate review applies to the ultimate issue of "consent."

## III. DISCUSSION

This court has "recognized a few exceptions to the warrant requirement of article I, section 7 of the Hawai'i Constitution [(1978)[6]]

---

5. As noted above, Officer D'Aquila testified that Trainor responded, "Okay," to her pat down request.

6. Article I, section 7 of the Hawai'i Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrant shall issue but upon probable cause, supported

256

in the context of seizures," *Kearns,* 75 Haw. at 568, 867 P.2d at 908, including the following:

> the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot. *State v. Melear,* 63 Haw. 488, 493, 630 P.2d 619, 624 (1981); and the police may engage in an investigative encounter with an individual if the individual "consents." *Quino,* 74 Haw. at 173–75, 840 P.2d at 364–65.

*Id.* at 569, 867 P.2d at 908 (footnotes omitted).

In *Kearns,* this court reaffirmed the "two-step analysis," first articulated in *Quino,* for determining whether, consistent with the protections afforded by article I, section 7, the prosecution can "justify the pre-arrest questioning of an individual as a 'consensual encounter.'" *Kearns,* 75 Haw. at 565, 867 P.2d at 907. "Under that analysis, the court must first determine at what point, if at all, the individual was 'seized.' The court must then determine if, prior to the seizure, the individual voluntarily and intelligently consented." *Id.* "[T]he determination as to whether a reasonable person would feel free to leave is an objective question while the determination as to whether the defendant consented to the questioning is a subjective one[.]" *Id.* at 565 n. 3, 867 P.2d at 907 n. 3.

A. *Officer D'Aquila Had Effectively Seized Trainor, Within The Meaning Of Article I, Section 7 of the Hawai'i Constitution, At Least By The Time She Asked "To Take A Look" At Trainor's Airline Ticket.*

As we have indicated, a person is "seized" in the constitutional sense if, from an objective standpoint and given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. *Kearns,* 75 Haw. at 566, 867 P.2d at 907; *Quino,* 74 Haw. at 168–73, 840 P.2d at 362–64. In *Kearns,* we further clarified that "a person is seized . . . when a police officer approaches that person for the express or implied purpose of investigating him or her

> by oath or affirmation, and particularly describing the place to be searched and the per-

for possible criminal violations and begins to ask for information." 75 Haw. at 567–68, 867 P.2d at 907–08.

■ It is self-evident from Officer D'Aquila's testimony—and the prosecution does not dispute—that she followed and questioned Trainor, from the moment of her first observation of his physical appearance and demeanor (which, according to her, generated an objective basis for approaching him), for the sole and express purpose of investigating Trainor for possible illegal drug trafficking. The conduct of such investigations, after all, was her only assignment at the time. Her queries escalated almost immediately from an ostensibly casual conversation to a focused and intrusive quest for evidence of criminal wrongdoing.

In other words, "Officer [D'Aquila's] questions were designed to investigate [Trainor] for drug possession, and [Trainor] was expressly made aware of that from the outset." *Kearns,* 75 Haw. at 567–68, 867 P.2d at 908. That being the case, Trainor "was seized when Officer [D'Aquila] began to ask him for information." *Id.* at 568, 867 P.2d at 908. In *Kearns,* the investigating police officer began to ask the defendant for information by asking him to produce his driver's license and airline ticket. *Id.* In the present case, Officer D'Aquila began the questioning by asking Trainor to identify his point of origin, his place of residence, and his reason for being in Hawai'i. Whenever Trainor's seizure commenced, we hold that it had clearly been effected by the time Officer D'Aquila asked "to take a look" at Trainor's airline ticket and driver's license.

> "For plainly [the defendant] was 'seized' . . . when the officers asked him to produce his driver's license and airline ticket. . . . By identifying themselves and asking for [the defendant's] airline ticket and driver's license the officers, as a practical matter, engaged in a 'show of authority' and 'restrained [the defendant's] liberty.' It is simply wrong to suggest that a traveler feels free to walk away when he has been approached by individuals who have identi-

> sons or things to be seized or the communications sought to be intercepted.

fied themselves as police officers and asked for, and received, his airline ticket and driver's license."

*Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 511–12, 103 S.Ct. 1319, 1331–32, 75 L.Ed.2d 229 (1983) (Brennan, J., concurring)) (brackets and ellipsis points in original).

The remainder of Officer D'Aquila's encounter with Trainor, following the seizure, became increasingly inquisitorial and coercive. Officer D'Aquila perused the airline ticket to ascertain the name of the person to whom it had been issued and the means of payment. She next requested proof of identity, as a result of which Trainor produced his driver's license. Noting that the names appearing on the airline ticket and driver's license were not the same, the intrusiveness of Officer D'Aquila's questions steadily increased, from an inquiry as to whether Trainor knew anyone in Hawai'i, to where he planned to stay, to whether he was carrying any kind of marijuana or narcotics with him, to whether she could search his bag, to whether he had anything around his waist, and finally to whether she could pat him down and thereby search his person. Thus, throughout the encounter, Officer D'Aquila placed Trainor in the position of having to prove his innocence in order to make her go away, while at the same time creating "a coercive environment in order to develop reasonable suspicion to justify [his] detention." *Quino,* 74 Haw. at 175, 840 P.2d at 365.

As in *Quino,*

> [t]he record establishes that Officer [D'Aquila] initially approached [Trainor] by starting an apparently innocuous "voluntary conversation." This "voluntary conversation" soon evolved into an interrogation, as Officer [D'Aquila's] questions grew more intrusive and accusatory in nature. The questions were also pretextual, specifically designed to elicit responses that would either vindicate or implicate [Trainor].
>
> In a ... police-citizen encounter such as this, the police exercise complete control over the interaction. The course of the questioning and the insinuative nature of the questions are left entirely to the discretion of the officer. For example, even

after [Trainor] informed Officer [D'Aquila] that he knew nothing about narcotics, she sought to inspect his carry-on bag. When she found nothing in the carry-on, Officer [D'Aquila] ... requested a pat down search.... Moreover, the circumstances beg[a]t an obligation [on the part of] the citizen to reply to any and all questions, no matter how intrusive, lest the authorities deem [the citizen's] conduct suspicious. Had [Trainor] cooperated by producing his airline ticket and identification, but refused an inspection of his bags or a pat down search, the officer's suspicion would surely have been aroused. Thus, the police investigation is benefitted immensely by the pretextual stop and questioning process. Here, Officer [D'Aquila] was able to observe [Trainor's] body language and evaluate his responses. If [Trainor's] behavior had provided an objective basis to suspect criminal activity, a *Terry* stop could have been effected.

*Id.* at 172–73, 840 P.2d at 363–64 (footnote omitted).

**B.** *The Pre–Encounter Record Is Devoid Of Specific And Articulable Facts Sufficient to Warrant A Person Of Reasonable Caution In Believing That Criminal Activity Was Afoot; Accordingly, Officer D'Aquila Lacked Justification To Initiate An Investigative Encounter With Trainor.*

■ Indeed, the prosecution argues on appeal that, *if* Trainor was seized at all, the seizure was justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), on the theory that "[Trainor's] behavior, together with other factors observed of him, provided [Officer] D'Aquila with an objective basis to suspect that criminal activity may have been afoot." In *Terry,* the United States Supreme Court held, as a matter of federal constitutional law, that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous, where in the course of investigating this behavior he identifies

himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30, 88 S.Ct. at 1884–85.

For purposes of interpreting the parameters of article I, section 7 of the Hawai'i Constitution, this court, in *Melear,*

delineated the circumstances under which the police may properly conduct an investigative stop of an individual:

It is well established that a law enforcement officer may "in appropriate circumstances and in [an] appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry* [, 392 U.S. at 22, 88 S.Ct. at 1880]; *State v. Barnes,* 58 Haw. 333, 337, 568 P.2d 1207, 1211 (1977). We stated in *State v. Barnes, supra,* at 338, 568 P.2d at 1211:

To justify an investigative stop, short of an arrest based on probable cause, "the police must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The ultimate test in these situations [is] whether [ ] a man of reasonable caution would be warranted in *believing that criminal activity was afoot* and that the action taken was appropriate. (Citations omitted.)

[*Melear,*] 63 Haw. at 493, 630 P.2d at 624 (emphasis added).

*Quino,* 74 Haw. at 178–79, 840 P.2d at 366 (Levinson, J., concurring) (some brackets in original and some added).

The prosecution insists that, unlike the investigating officer in *Quino,* Officer D'Aquila utilized "the [objective] indicia of narcotics trafficking" or, put differently, a "drug courier profile" in determining whom to approach. In this connection, the prosecution points to Officer D'Aquila's training in drug interdiction, as a result of which she presumably acquired the means to identify drug couriers with reliability and accuracy.[7] Specifically, Officer D'Aquila relied on the following observations of Trainor's dress and demeanor in the airport's baggage claim area as the justification for initiating her encounter with him: (1) Trainor was wearing baggy clothes; (2) he was traveling alone; (3) he had only carry-on luggage; (4) his face was flushed and perspiring; (5) he made darting looks around the baggage claim area; and (6) he walked quickly as if he were in a hurry to leave the airport. According to Officer D'Aquila, each of these characteristics was consistent with the "profile" of a drug courier.

In *Kearns,* however, we noted that

the police observed [the defendant] arrive on a flight from Los Angeles wearing a jacket and carrying a suit bag, 'fondle' his back while walking quickly to the baggage claim area, look around upon entering the baggage claim area, retrieve his suitcase when it arrived on the luggage carousel, and stop momentarily near the exit to look outside.

75 Haw. at 569–70, 867 P.2d at 908. In our view, "[t]hese observations clearly provided neither probable cause to believe that [the defendant] was committing a crime nor a reasonable suspicion that criminal activity was afoot." *Id.* at 570, 867 P.2d at 908. And, as Justice Marshall, dissenting, noted in *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the supposed characteristics of drug couriers, even considered in combination, " 'describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that

7. As noted in section I of this opinion, by her own admission, the reliability and accuracy of

Officer D'Aquila's acquired identification skills apparently did not exceed ten percent.

as little foundation as there was in this case could justify a seizure.' " 490 U.S. at 14–15, 109 S.Ct. at 1589 (quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980)).[8]

As in *Kearns, Sokolow,* and *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619 (1994), *see supra* note 8, the "characteristics" on which Officer D'Aquila relied in "encountering" Trainor obviously described an enormous set of presumably innocent travelers, potentially including some ninety percent of the travelers whom Officer D'Aquila had previously "encountered" herself. *See supra* note 7. To allow the police to conduct *Terry* stops based upon such insubstantial grounds would be tantamount to condoning the very random, suspicionless searches that we condemned in *Quino*. After all,

> article I, section 7 of the [Hawai'i] Constitution was "designed to protect the individual from arbitrary, oppressive, and harassing conduct on the part of government officials." [*Nakamoto v.*] *Fasi*, 64 Haw. [17,] 23, 635 P.2d [946,] 952 [ (1981) ].
>
> . . . .
>
> It is precisely because article I, section 7 of the [Hawai'i] Constitution was designed, among other things, " 'to safeguard the privacy . . . of individuals against arbitrary invasions' " and "arbitrary, oppressive, and harassing conduct" by the police, *Fasi*, 64 Haw. at 20, 23, 635 P.2d at 950, 952, that

we have conditioned an investigative stop on the police officer's capacity " 'to point to specific and articulable facts . . .' [warranting a reasonable belief] that criminal activity is afoot." *Melear*, 63 Haw. at 493, 630 P.2d at 624. To require otherwise would be to invite the very sort of "staged" and "pretextual" police-citizen encounter that occurred in the present case.... Such charades do indeed permit the police to seize individuals . . . at random and require them to convince the officers of their innocence of wrongdoing. They also potentially permit the police to sanitize an unlawful suspicionless "encounter" by construing the subject's non-cooperation as "suspicious" or "flight" and then claiming "probable cause" to arrest. *Cf. Melear*, 63 Haw. at 494, 630 P.2d at 625; *Sibron v. New York*, 392 U.S. 40, 66–67 [88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917] (1968).

*Quino*, 74 Haw. at 178–80, 840 P.2d at 366 (Levinson, J., concurring) (some brackets and ellipsis points in original and some added).

We hold, on the record before us, that Officer D'Aquila lacked specific and articulable facts sufficient to warrant a person of reasonable caution in believing that Trainor was engaged in criminal activity and that, accordingly, Officer D'Aquila was unjustified in initiating an investigative "encounter" with Trainor.

---

8. In *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619 (1994), the Pennsylvania Supreme Court declined to find reasonable suspicion in a walk and talk case decided under to the Pennsylvania Constitution. The *Lewis* court held that the fact that an individual's actions comported with a "drug courier profile," which included such characteristics as (1) travel to and from a drug source city, (2) payment for train tickets in cash, (3) frequent trips with quick returns, (4) displays of large amounts of cash, (5) alertness to surroundings, and (6) lack of luggage or packages, did not, in and of itself, give rise to reasonable suspicion of criminal activity. The *Lewis* court reasoned as follows:

> The danger inherent in defining reasonable suspicion in the context of a "drug courier profile" is that the police officer's suspicion is not aroused by personal observation of an individual whose behavior sets him apart from other travelers. The use of a drug courier

profile encourages the police officer to direct his attention to any individual whose behavior falls within an over-inclusive set of characteristics that include innocent actions. A drug courier profile should serve only as a starting point of, and not as a substitute for, independent observation of an individual's behavior.

> . . . .

> The facile reliance on drug courier profiles is reminiscent of the generalized suspicions historically used to justify the general warrants of the British [in colonial America]. While the use of the drug courier profile is not per se unreasonable, a police officer must observe "unusual and suspicious conduct on the part of the individual seized which leads him to reasonably conclude that criminal activity may be afoot...."

636 A.2d at 624–625 (citations omitted) (ellipsis points in original). We agree with the *Lewis* court's analysis.

C. *The Prosecution Failed To Satisfy Its Burden Of Proving That The "Encounter" Between Officer D'Aquila And Trainor Was Voluntary And Uncoerced; Accordingly, The Circuit Court Did Not Err In Concluding That Trainor Did Not Consent To The Pat Down.*

The prosecution's final argument is that, even if Trainor was "seized" in the constitutional sense, he nevertheless gave "a voluntary and informed consent to speak with and to be patted down" by Officer D'Aquila. The prosecution urges that the circuit court thus erred in concluding that Trainor's "seizure" was unlawful. For the following reasons, we disagree.

■■■■ As we have noted, one exception to the warrant requirement of article I, section 7 of the Hawai'i Constitution is that "the police may engage in an investigative encounter with an individual if the individual 'consents.'" *Kearns,* 75 Haw. at 569, 867 P.2d at 908 (citing *Quino,* 74 Haw. at 173–75, 840 P.2d at 364–65). However, " '[c]onsent in the constitutional sense means more than the absence of an objection . . .; it must be shown that such consent was freely and voluntarily given." *State v. Bonnell,* 75 Haw. 124, 147–48, 856 P.2d 1265, 1277 (1993) (citations omitted). Thus, "mere acquiescence to questioning, in and of itself, is insufficient to establish consent to the seizure." *Kearns,* 75 Haw. at 571, 867 P.2d at 909 (citing *Quino,* 74 Haw. at 175, 840 P.2d at 364). In the context of walk and talk investigations (*i.e.,* "investigative encounters"), "[c]onsent . . . can hardly be viewed as either voluntary or intelligent" if it is obtained through such "material nondisclosures" as an officer's failure to advise the "consenting" individual that the officer is investigating illegal drug trafficking and that the individual is "free to go at any time." *Quino,* 74 Haw. at 175, 840 P.2d at 364. Furthermore, it is the prosecution's burden to prove that consent, if any, "was voluntary and uncoerced." *Id.* at 174,

840 P.2d at 364 (citing *State v. Pau'u,* 72 Haw. 505, 509, 824 P.2d 833, 835 (1992)).

■■■■ In light of the foregoing, we articulated the rule in *Kearns* that

an investigative encounter can only be deemed "consensual" if (1) prior to the start of questioning, the person encountered was informed that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) the person thereafter voluntarily participated in the encounter.

*Kearns,* 75 Haw. at 571, 867 P.2d at 909.[9] The *Kearns* rule is subject to "two significant corollaries . . ., one of which is expressly stated in the opinion of the court and the other clearly implied." *Id.* at 573, 867 P.2d at 910 (Levinson, J., concurring).

First, there can be no "consent" to a "seizure" once the seizure has occurred in the constitutional sense, that is, after the seizure has *already* been effected. Therefore, where a seizure coincides with or precedes "interaction between the police and [an] individual," it follows tautologically that the seizure cannot be constitutionally justified on the ground that the individual has "consented" to it.

The second corollary derives from our recognition that "the determination as to whether a reasonable person would feel free to leave is an *objective* question while the determination as to whether the [person] consented to the questioning is a *subjective* one." By its very nature, however, the subjective component of the inquiry regarding consent *cannot* be a matter of whether the seized person has been informed that he or she has the right to decline to participate in the encounter and is free to leave at any time. After all, the person either has or has not been so informed. . . . Accordingly, the subjectivity of the "consent" determination springs by definition from the question whether, *after* being given the prerequisite advice by the

---

9. An individual's "consent" must, of course, be given prior to the seizure. Most seizures, however, occur at the inception of interaction between the police and the individual. In those situations, there is virtually no way that the individual could consent prior to the sei-

zure. For this reason, the consent exception to the warrant requirement will rarely be applicable.

*Kearns,* 75 Haw. at 569 n. 5, 867 P.2d at 908 n. 5.

police, the person "voluntarily participate[s] in the encounter."

It therefore follows that, even if a "seized" person is given the prerequisite advice by the police, the court must still determine on the record before it whether the person has participated in the encounter "voluntarily." If the participation is voluntary, then the person has "consented" to the encounter; if it is not, then the person has not given "consent."

*Id.* at 573–74, 867 P.2d at 910 (Levinson, J., concurring) (brackets and emphasis in original) (citations omitted).

█ We now address the question whether, pursuant to the two-pronged *Kearns* rule, the prosecution has satisfied its burden of proving that Officer D'Aquila's investigative encounter with Trainor was "consensual." The first inquiry is whether, prior to the start of questioning, Officer D'Aquila informed Trainor that he had the right to decline to participate in the encounter and could leave at any time. As indicated in section I. of this opinion, Officer D'Aquila's only direct interaction with Trainor, prior to informing him that he was not under arrest and was free to leave at any time, consisted of announcing her office, displaying her badge, asking whether she could talk to him for a minute, and advising him that she was investigating narcotics trafficking at the airport. The first prong of the *Kearns* rule has therefore been satisfied.

The second inquiry is whether, after being given the requisite advice, Trainor "voluntarily" participated in the investigative encounter. To date, this court has not undertaken to devise a universal theorem, the mechanical application of which would or could precisely quantify the "voluntariness" of a person's participation in a "walk and talk" encounter. Although the present appeal affords us the opportunity to attempt to do so, we decline the opportunity because we agree with the United States Supreme Court that there is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). However, we also

agree that if a person's "will has been overborne and his [or her] capacity for self-determination critically impaired," voluntariness is lacking. *Id.* at 225, 93 S.Ct. at 2046.

█ Thus, in an analogous context, "the question whether a consent to a *search* was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2047–48 (emphasis added). This is because

the [f]ourth and [f]ourteenth [a]mendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the [f]ourth [a]mendment is directed.

*Id.* at 228, 93 S.Ct. at 2048.

Hawai'i case law is in accord. *See, e.g., State v. Russo,* 67 Haw. 126, 137, 681 P.2d 553, 562 (1984) ("Whether consent to a search was freely and voluntarily given ... must be determined from the totality of circumstances surrounding the defendant's purported relinquishment of a right to be free from unreasonable searches and seizures." (Citations omitted.)); *State v. Patterson,* 58 Haw. 462, 468, 571 P.2d 745, 749 (1977) ("It is well-settled that when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving ... that the consent was, in fact, freely and voluntarily given.... However, whether consent to search has been given voluntarily is a question of fact to be determined by the trial court from the 'totality of all the circumstances.'" (Citations omitted.)); *State v. Price,* 55 Haw. 442, 443, 521 P.2d 376, 377 (1974) (equating "voluntary" with "uncoerced"). And to the extent that "consent" to an investigative "walk and talk" encounter entails a waiver of the protections of article I, section 7 of the Hawai'i Constitution, which are designed, among other things, "to safeguard the privacy ... of individuals against arbitrary invasions" by the police, *see Fasi,*

64 Haw. at 20, 635 P.2d at 950, our recent statement in *Merino* has direct application:

"[W]aiver is a question that requires application of constitutional principles to the facts as found. Accomplishment of this task requires us to examine the entire record and make an independent determination of the ultimate issue ... based upon that review and the totality of the circumstances...."

81 Hawai'i at 220, 915 P.2d at 694 (quoting *State v. Hoey*, 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994)).

In light of the foregoing propositions, we believe that the following "consent" analysis is as relevant to seizures as it is to searches:

The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a "voluntary" consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of "voluntariness."

*Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2048–49.

On the record before it, the circuit court concluded as a matter of law that, despite Officer D'Aquila's initial admonition that he was free to leave and was not under arrest, her subsequent pat down of Trainor was not voluntarily undertaken and that Trainor therefore did not consent to it. Having reviewed "the totality of [the] circumstances surrounding the defendant's purported relinquishment of [the] right to be free from unreasonable searches and seizures," *see Russo*, 67 Haw. at 137, 681 P.2d at 562, we cannot say that the circuit court's COL is wrong. In this regard, we necessarily return to the factors that proved outcome-dispositive of our "seizure" analysis, *supra*, in section III.A.

It is uncontroverted (and Trainor must have been acutely aware) that the only motivation for Officer D'Aquila's "encounter" with Trainor was to pursue the possibility that he was engaged in the trafficking of illegal drugs. Her queries escalated swiftly from ostensibly casual to focused, inquisitorial, and intrusive. Having engaged in a "show of authority" by identifying herself as a police officer assigned to detect the presence of narcotics at the airport, ascertaining Trainor's identity, and inspecting his airline ticket and driver's license, it would be "simply wrong to suggest that [Trainor would] feel[ ] free to walk away." *Kearns*, 75 Haw. at 568, 867 P.2d at 908 (quoting *Royer*, 460 U.S. at 511–12, 103 S.Ct. at 1331–32 (Brennan, J., concurring)).[10] Moreover, Officer D'Aquila's questions were "pretextual" in the sense that they were "specifically designed to elicit responses that would either vindicate or implicate" Trainor. *Quino*, 74 Haw. at 172, 840 P.2d at 363. Officer D'Aquila "exercise[d] complete control over the interaction." *Id.* Clearly, "the circumstances beg[a]t an obligation" on Trainor's part "to reply to any and all questions, no matter how intrusive," lest Officer D'Aquila "deem [his] conduct suspicious." *Id.* Had Trainor "cooperated by producing his airline ticket and identification, but refused an inspection of his bag[ ] or a pat down search, the officer's suspicion would surely have been aroused." *Id.* at 172–73, 840 P.2d at 363. Thus, Officer D'Aquila's

---

10. Indeed, of the approximately one hundred persons with whom Officer D'Aquila had performed the "walk and talk" pursuant to the post-*Quino* procedure, which entailed immediate identification of her office and purpose and an admonition that the person was free to leave, Officer D'Aquila testified that only "a few" had spurned the encounter. This hardly bespeaks "voluntariness."

investigation was "benefitted immensely by the pretextual stop and questioning process." *Id.* at 173, 840 P.2d at 363.

In light of the totality of the circumstances reflected in the record before us, it is apparent that the position in which Officer D'Aquila placed Trainor was inherently coercive and was calculated to overbear Trainor's will and critically impair his capacity for self-determination. *See Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2046–47. That being the case, we hold that the prosecution failed to satisfy its burden of proving that Trainor's "consent," if any, to the pat down "was voluntary and uncoerced." *See Quino,* 74 Haw. at 174, 840 P.2d at 364; *Patterson,* 58 Haw. at 468, 571 P.2d at 749.[11] Accordingly, we hold that the circuit court did not err in concluding that the pat down was non-consensual.

## IV. *CONCLUSION*

At the latest, Trainor was seized, within the meaning of article I, section 7 of the Hawai'i Constitution, when Officer D'Aquila asked "to take a look" at his airline ticket. The seizure cannot be justified as an "investigative stop" because, at the time of its occurrence, Officer D'Aquila lacked specific and articulable facts sufficient to warrant a person of reasonable caution in believing that Trainor was engaged in criminal activity. Although Officer D'Aquila advised Trainor that he was not under arrest and was free to leave at any time, the prosecution nevertheless failed to satisfy its burden of proving that Trainor voluntarily submitted to the "investigative encounter." We therefore affirm the circuit court's July 7, 1993 order granting Trainor's motion to suppress.

11. As indicated *supra* at note 4, the prosecution contends that the circuit court's FOF No. 25 was clearly erroneous insofar as it found that Trainor did not respond "verbally" to Officer D'Aquila's request to pat him down. The prosecution is correct that Officer D'Aquila's uncontroverted testimony was that Trainor responded, "Yeah," to the request. Our present holding, however, renders the circuit court's error harmless in this regard. To the extent that Trainor's response betokened "mere acquiescence," it was nonetheless "insufficient to establish consent." *Kearns,* 75 Haw. at 571, 867 P.2d at 909.