J-A29017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                               :              PENNSYLVANIA
                               :
            v.                 :
                               :
                               :
                               :
JULIO CESAR TORRES             :
                               :
          Appellant            :   No. 1600 WDA 2018


Appeal from the Judgment of Sentence Entered, October 11, 2018,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0015964-2017.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MARCH 13, 2020**

Julio Cesar Torres appeals from the judgment of sentence imposed
following his conviction of possession with intent to deliver ("PWID"),
possession of a controlled substance (heroin), possession of drug
paraphernalia, and criminal conspiracy.[1]  We affirm.

The trial court set forth the relevant findings of fact, as follows:

> On August 4, 2016, Trooper Patrick Bouch of the
> Pennsylvania State Police received a tip on his cell phone alerting
> him that two suspicious individuals, Fasseem McPherson
> (McPherson) and Julio Torres (Appellant) checked into the Comfort
> Inn on Banksville Road.  The individuals arrived at 7:30 a.m., an
> unusual time to check into a hotel, with only one suitcase between
> them.  The person relaying the tip indicated that the individuals
> booked a room through a third-party online provider, and the
> room was unavailable when they tried to check-in.  . . .  Trooper

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 35 Pa.C.S.A. §§ 780-113(a)(16), (30), (32); 18 Pa.C.S.A. § 903.

Bouch ran a background check on McPherson, and based on those results he decided to investigate further by establishing surveillance on [Torres] and McPherson. Surveillance was established at 12:30 p.m. on August 4, 2016, at the Comfort Inn.

Approximately eight times over a twelve hour period the two individuals came out of the hotel to smoke cigarettes, listen to music, and talk on their cell phones. They also made trips to a nearby Eat 'n Park and gas station convenience store [for snacks and deodorant] and immediately returned to the hotel. [They also asked the hotel for a toothbrush.] Their behavior was considered to be inconsistent with normal visitor patterns by investigators, and consistent with potential drug dealing activity.

[Torres] and McPherson were observed exiting the hotel late the next morning wearing the same clothing they had on the previous day. They were picked up by a zTrip taxi and carried the same suitcase they were observed carrying the day before. [Torres] loaded the suitcase into the taxi and both men traveled to downtown Pittsburgh. Surveillance of the zTrip taxi revealed an unusual path of travel consistent with someone attempting to evade law enforcement.

[Torres] and McPherson exited the taxi with the suitcase at the corner of 10th and Liberty in downtown Pittsburgh and went to the Ten Penny Restaurant. After eating at the restaurant, the two men walked to the Greyhound Bus Station with the same suitcase. [Torres] entered the bus station while McPherson stood outside the "discharge" area with the suitcase. They remained there a short time and then got into a zTrip taxi and departed. A short time later they arrived at the Double Tree Hotel (actually across the street from the bus station) still in possession of the suitcase. They paid cash for a room at the Double Tree and exited the hotel at approximately 2:13 p.m. without the suitcase.

Around 4 p.m. they were observed walking on 6th Avenue in downtown Pittsburgh, and [Torres] was carrying a brand new Adidas gym bag with the tags still attached. When they returned to the lobby of the Double Tree hotel, Trooper Bouch and members of the surveillance unit approached [Torres] and engaged in a conversation with him. [Torres] immediately [became] nervous and would not make eye contact. Trooper Bouch questioned [Torres] about his travel plans in the Pittsburgh area and how he was employed. [Torres] responded that he was in the music

business and that he was there for a concert at the "Pittsburgh City College" (no such institution exists).

At that time, Trooper Bouch asked [Torres] for his consent to search his hotel room. [Torres] replied that McPherson was the one who had rented the room and that he had the key. [Torres'] bag was searched revealing new items such as socks, toiletries, T-shirts, which Trooper Bouch found suspicious as it indicated to the officer that they did not know how long they would be in the Pittsburgh area. Trooper Bouch then spoke to McPherson, who was sweating profusely, acting nervous, and rubbing his stomach. Trooper Bouch requested permission to search their hotel room. McPherson became agitated about being "kicked out" of his hotel room, so officers arranged for an alternate room for [Torres] and McPherson to occupy while a warrant was obtained and their room was searched. [Torres] then accepted the keys to the other room, thanked them, and both [Torres] and McPherson then left the hotel and did not return.

A search warrant was issued and the hotel room was searched, wherein the suitcase carried by [Torres] and McPherson was located. A pair of headphones and hat identical to those [Torres] and McPherson were seen wearing the previous day were found on the TV stand in the room. A Nike shoe box was also discovered in the room, which was found to contain a significant amount of packaged heroin (approximately 9,000 stamp bags), and $11,000 in U.S. currency. [Police also found drug paraphernalia in the zippered compartment of the silver suitcase (boxes of rubber bands for drug packaging).] . . . Police estimated the street value of the heroin between $27,000 and $63,000, depending whether it was being sold in bulk or as individual packets.

[Torres] was later arrested in New York, extradited to Pittsburgh, and charged [with various drug related offenses and conspiracy].

Trial Court Opinion, 6/25/19, at 4-7.

Torres moved to suppress the heroin and currency found in the hotel room on the basis that police lacked probable cause to support the warrant issued for the search. The trial court denied suppression. The matter

proceeded to trial, at the conclusion of which a jury convicted Torres of the above-described offenses. The trial court sentenced him to an aggregate prison term of five to ten years. Torres filed a timely notice of appeal.[2] Both Torres and the trial court complied with Pa.R.A.P. 1925.

Torres raises the following issues for our review:

I. Did the trial court err by concluding that there was sufficient probable cause to support the issuance of a search warrant?

II. Was there insufficient evidence to prove, beyond a reasonable doubt, that [Torres] possessed any controlled substances or paraphernalia, or that he entered into a criminal conspiracy related thereto?

III. The jury posed a question to the trial court regarding the difference between "common sense" and "conjecture" in the decision-making process. Did the trial court err in providing its impromptu instruction to the jury in this regard?

Torres' Brief at 6.

In his first issue, Torres challenges the denial of suppression. On appeal from the denial of a suppression motion:

Our standard of review . . . is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court,

_____

[2] The trial court imposed its sentence on October 11, 2018, giving Torres until November 10, 2018 to file his appeal. That date fell on a Saturday, and the following Monday, November 12, 2018, was a legal holiday. **See** 1 Pa.C.S.A. § 1908. Thus, we consider his appeal filed on November 13, 2018, to be timely filed.

- 4 -

we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Galendez*, 27 A.3d 1042, 1045 (Pa. Super. 2011) (*en banc*) (citation omitted). Additionally, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 A.3d 1278, 1281-82 (Pa. Super. 2017) (citation omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Id*. at 1282 (citation omitted).

Further, our standard of review of the sufficiency of probable cause underlying a search warrant is well-settled:

> [The] reviewing court is not to conduct a *de novo* review of the issuing authority's probable cause determination, but is simply to determine whether or not there is substantial evidence in the record supporting the decision to issue a warrant . . . In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a commonsense, non-technical manner.

*Commonwealth v. Gagliardi*, 128 A.3d 790, 794 (Pa. Super. 2015) (citation omitted). "If a substantial basis exists to support the magistrate's probable cause finding, [the suppression court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant." *Id*. at 795 (citations omitted).

The trial court considered Torres' first issue and determined that it properly denied suppression because the affidavit of probable cause amply supported the issuance of a search warrant. It reasoned as follows:

> The affidavit of probable cause in this case clearly established the requisite enforcement's surveillance of [Torres] and McPherson evidenced several key characteristics and behaviors of persons trafficking narcotics. Specifically, their suspicious movements in the Pittsburgh area, paying cash for hotel rooms, lacking sufficient luggage for the trip, purchasing a new bag and personal items while on the trip, their drug-related criminal histories, attempting to elude law enforcement, giving conflicting/false stories as to why they were in Pittsburgh, and their nervous demeanor upon being confronted by law enforcement all clearly establish that sufficient probable cause existed for the issuance of the search warrant.

Trial Court Opinion, 6/27/19, at 8-9.

Torres initially challenges the trial court's denial of suppression based on its finding that the officers' observations of Torres and McPherson aligned with certain indicators of criminal activity known as a "drug courier profile." Torres' Brief at 26.[3] According to Torres, the actions which the trial court

_____

[3] Citing to **Commonwealth v. Lewis**, 636 A.2d 619 (Pa. 1994), Torres additionally contends that our Supreme Court has expressed reservations about law enforcement's reliance on drug courier profiles to arouse reasonable suspicion to conduct an investigatory stop. **See id**. at 624 (holding that "[a] drug courier profile should serve only as a starting point of, and not as a substitute for, independent observation of an individual's behavior"). However, **Lewis** is inapposite, as it involved a challenge to an investigatory stop followed by a warrantless search, rather than an investigatory stop followed by a search conducted pursuant to a warrant, as occurred herein. Notably, Torres does not challenge the investigatory stop by police. Moreover, the affidavit of probable cause supporting the search warrant issued in this matter provided ample independent observation of Torres' and McPherson's suspicious behavior by police.

found to be consistent with a drug courier profile, such as lacking sufficient luggage for the trip, purchasing a new bag and personal items, were also consistent with the behavior of a tourist on a short stay or a business executive staying in town longer than expected. With respect to his nervous demeanor, he argues that most citizens are likely to exhibit some signs of nervousness when confronted by police officers. Torres additionally argues that police had no basis to conclude that he appeared nervous, since they had never encountered him before and were unfamiliar with his normal disposition. He further asserts that there is an innocent explanation for his nervous demeanor, namely, that he suffered nerve damage and is used to dealing with NYPD, "who strong-arm people." *Id*. at 32.

Torres additionally challenges the trial court's finding of probable cause based on "conflicting/false statements." *Id*. Torres argues that "only the statements attributable to McPherson may objectively be called 'conflicting/false stories' based on the four corners of the affidavit." *Id*. at 33-34. He claims that the trial court had no basis to conclude that Torres' statements to police were objectively false or conflicting. According to Torres, the conflicting/false statements, coupled with the totality of the circumstances, provided at most, only a fifty percent probability that contraband would be found in the Double Tree hotel room.

Based on our review, we conclude that there is substantial evidence in the record supporting the decision to issue a warrant. The police officer who

prepared the affidavit of probable cause had more than twenty years of experience with drug dealing and trafficking investigations. In his affidavit, he detailed certain actions, circumstances and patterns that are often connected to the buying and selling of illegal narcotics. In particular, he explained that narcotics traffickers often travel to other locations without knowing the exact day and time the exchange will take place and that, "[o]ften times, it will take days to make sure that both parties have their narcotics and currency ready in order to make the trade." Affidavit of Probable Cause, 8/5/16, at 6. The officer further explained that, for this reason, police look for certain indicators of drug activity in every hotel in this vicinity, including (1) guests visiting from drug source cities; (2) guests carrying large amounts of cash and paying for rooms with cash; (3) guests arriving at unusual hours without a reservation; (4) guests who frequently talk on a cellular phone; (5) guests that seem to stay in their room more than normal; (6) guests that have little or no luggage, and who may need to purchase luggage and clothing; (7) guests who seem to be "killing time;" and (8) guests who appear extremely nervous when encountered by police. *See id*. at 4-5.

The affidavit indicates that police officers closely observed Torres' and McPherson's activities for two days until they had ample evidence supporting their suspicions that the men were engaged in unlawful activities. The contents of the five and one-half page affidavit detailed numerous actions by Torres and McPherson, as observed by police, which were consistent with

individuals dealing in illegal narcotics. The two men arrived from New York City (an area synonymous with illegal drug activity) at 7:30 a.m. (an unusual hour), and checked into the Comfort Inn with only a single suitcase between them (little or no luggage). *Id*. at 5. On the first day of surveillance, police observed the two men going in and out of their Comfort Inn room for several hours, and talking on their cell phones (killing time and talking on cell phones). *Id*. at 5. They took a taxi to a gas station approximately one mile away to purchase deodorant and snacks. *Id*. When the taxi returned them to the Comfort Inn, only Torres got out. *Id*. McPherson took the taxi approximately 70 yards away to another hotel, then walked back to the Comfort Inn. *Id*. At some point that evening, the men asked the hotel for a toothbrush, providing some indicia that the suitcase did not contain toiletries. *Id*.

On the second day of surveillance, police observed that the men were wearing the same clothing that they wore on the prior day, indicating that the suitcase likely did not contain clothing. *Id*. at 6. The men checked out of the Comfort Inn with the suitcase, and took a taxi to downtown Pittsburgh, where they entered a restaurant with the suitcase, and then walked to the bus terminal with the suitcase. *Id*. They then took a taxi around the downtown area, only to arrive at the Double Tree Hotel, a mere three blocks from the bus terminal. *Id*. They then checked in to the Double Tree Hotel with the suitcase and paid $300 in cash for a room (paying for room with cash). *Id*. at _. Police later observed the men walking around downtown Pittsburgh

without the suitcase, but carrying a new gym bag with the price tag still on, and which was filled with new clothes and toiletries (needing to purchase luggage and clothing). *Id*.

The affidavit also detailed objectively false information provided by both individuals to police as to when they arrived in Pittsburgh, and inconsistent information regarding the purpose of their visit. Torres, in particular, indicated that he had arrived in Pittsburgh at 1:00 a.m. the prior day, when video surveillance showed him checking in to the Comfort Inn at 7:30 a.m. Torres indicated that he was in town to attend an event at the "Pittsburgh City College," when no such institution exists. *Id*. at 7. He indicated to police that he had $500 in his pocket (large amounts of cash). *Id*. Finally, he indicated that his only drug conviction was for a "little bit of weed," when police were aware that he had an extensive criminal history, including a prior conviction for PWID. *Id*.

Giving due deference to the issuing magistrate, we conclude that the affidavit provided a reasonable basis upon which the issuing authority could have made a common-sense decision that there was a probability that evidence of criminal activity would be found in the Double Tree hotel room. *See Gagliardi*, 128 A.3d at 794 (holding that the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner). While Torres argues that there could have been an

- 10 -

innocent explanation for some of the factors considered by the magistrate, the extent of the information contained in the affidavit, when considered in totality, provided substantial evidence to issue the search warrant. We therefore affirm the trial court's denial of suppression.

In his second issue, Torres challenges the sufficiency of the evidence supporting his convictions. Our standard of review of a sufficiency claim is as follows:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Franklin***, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and quotation marks omitted). The finder of fact is free to believe all, part, or none of the evidence presented, and determines the credibility of the witnesses. ***Commonwealth v. Boyd***, 73 A.3d 1269, 1274 (Pa. Super. 2013) (*en banc*).

Torres initially challenges the sufficiency of the evidence supporting the possession element of his convictions for PWID, possession of a controlled substance (heroin), and possession of drug paraphernalia. To establish PWID,

the Commonwealth must prove "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act." 35 P.S.§ 780-113(a)(30). To establish possession of a controlled substance, the Commonwealth must prove "[k]nowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act." *Id*. § 780-113(a)(16). Finally, to establish possession of drug paraphernalia, the Commonwealth must prove "[t]he use of, or possession with intent to use, drug paraphernalia for the purpose of . . . packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act." *Id*. § 780-113(a)(32).

Torres contends that there was no direct evidence that he actually possessed either a controlled substance or drug paraphernalia. He further claims that the Commonwealth failed to establish that he constructively possessed a controlled substance or drug paraphernalia. Torres argues that the trial court's conclusion that "the totality of the evidence established [his] conscious dominion of the contraband" is flawed because the court never instructed the jury on consciousness of guilt. Torres' Brief at 42. He argues that, without such an instruction, the jury had no basis to find or infer that Torres knew of the contraband. Torres also challenges the trial court's reasoning that the jury considered Torres' "conduct and pattern of behavior" as relevant to his intent. *Id*. at 45. Torres asserts that such a conclusion is

speculative because the jury, during its deliberations, questioned whether it could link Torres to possession of the heroin and agreeing to planning and conducting the crimes.

Torres concedes that the Commonwealth demonstrated that he had actual and constructive possession of the suitcase, and that the clothes found within the suitcase were more suited to his build than to McPherson's build. Nevertheless, Torres contends that such possession does not support a finding that he knew about or possessed the heroin in the shoebox or the drug paraphernalia. He claims that, in order to make such a finding, "one [must] speculate or presume that he was rummaging through these items or he was otherwise told of their contents." *Id*. at 47.

Finally, Torres contends that, if the evidence is insufficient to establish his actual or constructive possession of the heroin and drug paraphernalia, then the record must likewise be insufficient to demonstrate a conspiracy predicated on such possession. Torres argues that the failure to show that he had knowledge of the contraband negates any possibility of an agreement on the matter. While Torres concedes that the amount of heroin found in his hotel room, and its packaging, established that it was intended for distribution, he argues that those facts do not indicate who intended to distribute the heroin.

As our Supreme Court has explained, "[c]onstructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law

enforcement." ***Commonwealth v. Johnson***, 26 A.3d 1078, 1093-94 (Pa. 2011) (citation omitted). The existence of constructive possession of a controlled substance is demonstrated by "the ability to exercise a conscious dominion over the illegal substance: the power to control the [illegal substance] and the intent to exercise that control." ***Commonwealth v. Valette***, 613 A.2d 548, 550 (Pa. 1992) (citation omitted). An "intent to maintain a conscious dominion may be inferred from the totality of the circumstances." ***Commonwealth v. Macolino***, 469 A.2d 132, 134 (Pa. 1983). Thus, circumstantial evidence may be used to establish constructive possession of the illegal substance. ***Id***. Additionally, "[c]onstructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access." ***Valette***, 613 A.2d at 550.

The trial court considered Torres' sufficiency claim and determined that it lacks merit. It reasoned as follows: "[c]learly the conduct and pattern of behavior by both [Torres] and McPherson indicated that the suitcase and its contents (9,000 baggies of heroin) was a valuable possession, and the center of their activities in an effort to complete a major drug transaction. The totality of the evidence established [Torres'] conscious dominion of the contraband . . .." Trial Court Opinion, 6/27/19, at 11-12.

Evaluating the record in the light most favorable to the Commonwealth as the verdict winner, and giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence, we conclude that the evidence is

sufficient to establish the possession element of the crimes charged. As noted above, Torres concedes that the evidence established that he had both actual and constructive possession of the suitcase. From the circumstantial evidence presented, the jury could infer that Torres and McPherson secreted the shoe box full of heroin and currency and the boxes of rubber bands within the suitcase, and that Torres had both the intent and the power to exercise a conscious dominion over those items. *See Valette*, 613 A.2d at 550.[4] Thus, Torres' second issue warrants no relief.

In his final issue, Torres contends that the trial court erred in providing the jury with a supplemental instruction in response to the jury's question regarding the difference between common sense and conjecture. Specifically, he argues that the instruction provided by the trial court was neither clear nor accurate.

The trial court determined that Torres waived the issue because he did not raise it at trial. It reasoned as follows:

> During jury deliberations the jury submitted three questions to the trial court, one of which asked the court to distinguish between "common sense" and "conjecture" in the decision-making process. In response the trial court discussed that matter with counsel and after [Torres'] counsel objected to the court's initial proposed instruction, the trial court gave an instruction that

---

[4] We note that Torres' sufficiency claim regarding his conspiracy conviction is predicated on the success of his sufficiency challenge to the possession element of his other crimes. Based on our conclusion that the evidence of record is sufficient to establish PWID, possession of a controlled substance, and possession of drug paraphernalia, Torres' challenge to the conspiracy claim must also fail.

included [Torres'] counsel's suggestion. The trial court then gave a jury instruction consistent with its discussion with counsel.

At the conclusion of its instruction, the trial court asked both the Commonwealth and defense whether they had any proposed modifications or additions, at which time both counsels answered in the negative. As such, [Torres] was afforded every opportunity to raise an objection to the instruction as given but failed to do so.

Trial Court Opinion, 6/27/19, at 13-14 (some capitalization and citations to the record omitted).

Based on our review of the record, we agree with the trial court's determination that the issue is waived. In order to preserve an issue for appellate review, a litigant must make a timely and specific objection. *See Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008) (holding that a failure to offer a timely and specific objection results in waiver of the claim). As this Court has explained:

It is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "The absence of a contemporaneous objection below constitutes a waiver" of the claim on appeal. *Commonwealth v. Powell*, . . . 956 A.2d 406, 423 ([Pa.] 2008); *Tindall v. Friedman*, . . . 970 A.2d 1159, 1174 (Pa. Super. 2009) ("On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated.") (citation omitted)).

*Commonwealth v. Smith*, 213 A.3d 307, 309 (Pa. Super. 2019) (citation omitted).

At trial, the court discussed the jury's question, and indicated to counsel at a sidebar that "I intend to say is [*sic*] common sense is a practical judgment,

- 16 -

and it has some rational component versus guesswork and perhaps taking a leap." N.T. Trial, 7/20/18, at 211. Torres' counsel objected to the trial court's proposed response to the jury's question. However, the **sole** basis for Torres' objection was that it was up to each individual juror to determine the answer to the question presented. The trial court then indicated that it would modify its proposed response to the jury to include the language suggested by Torres' counsel, and asked if such modification was acceptable to Torres. Torres' counsel responded in the affirmative and thanked the trial court. That discussion consisted of the following exchange:

> [Torres' counsel:] For answering question three, as vague as it relates to question three, I know we are trying to be vague on how the [c]ourt is answering it, although **I would formally object and indicate it is up to each individual juror to be guided to an answer on that**. I don't know if the [c]ourt should answer otherwise. Obviously, we are not trying to slant them one way or the other but –
>
> THE COURT: I will include that aspect that it is up to each juror to make the decision.
>
> [Torres' counsel:] Okay.
>
> THE COURT: Based on their common sense and perceptions of common sense and conjecture, okay?
>
> [Torres' counsel:] Thank you.

**Id**. at 212.

Thereafter, the trial court provided the jury with an instruction regarding the difference between common sense and conjecture, and specifically included the language that Torres' counsel requested. It stated:

As I told you, every person must decide the case for him or herself, but only after there has been fair and reasonable discussion between the jurors, hearing each other out, listening to the other person's views. No juror should hesitate to change his or her view if you are convinced that it is erroneous. No one should give up a heartfelt opinion merely for the convenience of issuing a verdict. Again, you should have an open mind. Listen to the views of your fellow jurors in that regard. Now, common sense versus conjecture. This is a difficult question to answer in the sense that you ordinarily think commonsense is almost a self-defined term. Conjecture along that continuum shows a practical judgment with a rational component in it. I would suggest that conjecture is more guesswork and too big a leap in terms of one plus one in decision making to be comfortable with. Common sense seems to be practical judgement with rational overtone to it versus guesswork with more guesswork without that rational comfortable component. At this juncture, that's all I can do with that question, hopefully that helps.

*Id*. at 217-18. After providing this instruction, the trial court specifically asked counsel if there were "[a]ny proposed modifications or additions." *Id*. at 219. Torres' counsel responded "[n]o, your honor." *Id*.

Importantly, "[t]he purpose of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and, thereby, to conserve limited judicial resources." *Commonwealth v. Sanchez*, 36 A.3d 24, 32 (Pa. 2011). Here, the objection which Torres now raises on appeal (*i.e.*, that the instruction, as provided by the trial court, was neither clear nor accurate) was not timely or specifically raised before the trial court. Accordingly, the trial court was not provided with an opportunity to address or correct any problems associated with the

supplemental jury instruction it provided.[5]  ***Id***.  As Torres failed to contemporaneously raise these additional bases for objection in the trial court, we decline to address them on appeal.  ***See Commonwealth v. May***, 584 Pa. 640, 887 A.2d 750, 761 (Pa. 2005) (holding that an absence of contemporaneous objections renders an appellant's claims waived)

Judgment of sentence affirmed.


Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/13/2020

_____

[5] Torres additionally argues that raising any objection "would have been fruitless because the jury had been excused and was already leaving the room."  Torres' Brief at 54.  While the record indicates that the jury was leaving the room when the trial court asked if counsel had any proposed modifications or additions, this fact did not excuse Torres from raising a timely and specific objection to the supplemental instruction.  It was incumbent on Torres to bring to the trial court's attention **at that time** that the instruction provided was not clear or accurate, rather than indicating to the court that the instruction provided was acceptable.